UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| SAMSON RACIOPPI, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil No. 20-11357-LTS |
| | ) | |
| GOVERNOR CHARLIE BAKER, in his personal and official capacity as Governor for the State of Massachusetts; MAYOR MARTIN WALSH, in his personal and official capacity as the Mayor for the City of Boston; and COMMISSIONER WILLIAM EVANS, in his personal and official capacity as the Commissioner for the Boston Police Department, | ) ) ) ) ) ) ) ) ) | |
| | ) | |
| Defendants. | ) | |

ORDER ON DEFENDANTS' MOTIONS TO DISMISS (DOC. NOS. 10, 18)

July 6, 2021

SOROKIN, J.

Samson Racioppi brought this *pro se* action on August 11, 2020. Doc. No. 1. He names as defendants Governor Baker, Mayor Walsh, and Commissioner Evans, suing all three for violations of his constitutional rights under § 1983 and alleging an additional defamation claim against Walsh and Evans. Doc. No. 13-1 ¶¶ 36-45. Thereafter, Racioppi filed a Motion to Amend the Complaint, Doc. No. 13, and the defendants filed motions to dismiss the action. Doc. Nos. 11, 19. For the reasons that follow, the Court ALLOWS Racioppi's Motion to Amend and ALLOWS the defendants' Motions to Dismiss.

I.      BACKGROUND[1]

On August 11 and 12, 2017, the "Unite the Right" rally occurred in Charlottesville, Virginia. Doc. No. 13-1 ¶ 6. Heather Heyer was killed by a demonstrator during the event, sparking national outrage. Id. ¶¶ 6-7. A "Boston Free Speech" rally ("the Boston rally") was scheduled to occur a week later, on August 19. Id. Following the events in Charlottesville, Walsh made several statements to the media, including: "The whole premise behind what they're doing there—the white supremacist group and the neo-Nazis . . . From my understanding they want to come to Boston next week. There's no place for that type of hate." Id. ¶¶ 21-26.

Racioppi requested and was granted permission to speak at the Boston rally by the event organizers. Id. ¶ 9. After becoming a speaker but before attending the Boston rally, Racioppi engaged in media interviews where he disclaimed membership in any Nazi, white supremacist, or KKK organization. Id. ¶ 10.

On August 18, 2017, at a joint press conference with Walsh, "Governor Baker stated that he was working closely with Mayor Walsh and the City to coordinate efforts" for the Boston rally. Id. ¶ 30. Racioppi alleges that during this conference, Walsh referred to the organizers of the Boston rally "as hateful, even though they invited [Black Lives Matter]—A movement fighting for the rights of African-American people—to speak." Id. ¶ 25. During the same press

---

[1] Racioppi moved to amend his complaint before any responsive pleading, and before any defendant moved to dismiss. Accordingly, that motion (Doc. No. 13) is ALLOWED as a matter of course. Fed. R. Civ. P. 15(a)(1)(B). Because the original and Amended Complaint are nearly identical, the Court construes the defendants' motions as challenging the Amended Complaint. As Racioppi opposed the defendants' motions following his motion to amend, he has had an opportunity to respond in the context of his amended allegations. In this Order, the Court summarizes the facts as they are alleged in Racioppi's Amended Complaint.

conference, Evans said he had spoken to the FBI and established that there were "no threats" to the event. Id. ¶¶ 33, 37.

On August 19, 2017, Racioppi arrived at Boston Common intending to speak at the Boston rally. Id. ¶ 11. He walked through the crowd without any security issues from protesters, stopping to speak with a few of them. Id. Racioppi then approached a police officer standing near the perimeter of the secure area, informed the officer that he was a speaker at the event, and requested access to the bandstand. Id. ¶ 12. The officer said he could not enter at that location but explained to Racioppi where he could find an entry point. Id. This is the only direct interaction between Racioppi and any state or local official described in the Amended Complaint.

Racioppi followed the officer's directions, looking for an entrance, but stopped along the way for some interviews. Id. ¶ 13. By the time Racioppi returned to the secure area, the police had all moved to the inner perimeter, and no one remained to admit him beyond the outer perimeter. Id. ¶ 14. Racioppi spoke with members of the public, who told him that the police were not allowing anyone to enter. Id. Soon after, Racioppi observed other speakers being ushered away with a police escort. Id. ¶ 16. Racioppi remained at the Common until one of the Boston rally organizers informed him that a large crowd of protesters was about to arrive, and that they might be violent. Id. ¶ 17. Racioppi then left the Common. Id. ¶¶ 17-19.

After the Boston rally, Evans stated to the media: "We had a job to do. We did a great job. I'm not going to listen to people who come in here and want to talk about hate. And you know what? If they didn't get in, that's a good thing because their message isn't what we want to hear." Id. ¶ 34. Racioppi later learned that during the Boston rally, Walsh had marched with counter-protesters. Id. ¶ 27.

Racioppi instituted this action on August 11, 2020. His Amended Complaint alleges claims against all defendants for violation of the First Amendment when he was denied access to the bandstand, and violation of the Fourteenth Amendment when protestors outside the bandstand were permitted to continue their speech activity. Id. ¶¶ 36-40. He also alleges a claim for defamation against Walsh and Evans ("the municipal defendants") for statements made prior to and following the Boston rally. Id. ¶¶ 41-45. Governor Baker moved to dismiss on November 13, 2020, and the municipal defendants moved to dismiss on December 1, 2020. Racioppi opposed both motions, and they are now ripe for resolution.[2]

## II.   LEGAL STANDARD

A motion to dismiss must be granted when the court lacks subject matter jurisdiction or when the complaint fails to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(1), (b)(6). Courts apply the same basic principles to motions to dismiss under Rules 12(b)(1) and 12(b)(6). Lyman v. Baker, 954 F.3d 351, 359-60 (1st Cir. 2020). The court "must accept all well-pleaded facts alleged in the Complaint as true and draw all reasonable inferences in favor of the plaintiff." Watterson v. Page, 987 F.2d 1, 3 (1st Cir. 1993). In addition, "a *pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers." Abernathy v. Dewey, 277 F. Supp. 3d 129, 137 (D. Mass. 2016) (internal quotations omitted). Regardless of a plaintiff's *pro se* status, it remains the case that "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).

---

[2] The Court resolves the motions on the papers. No party has requested a hearing, and the Court finds that a hearing in this matter is unnecessary.

To satisfy the minimal requirements of notice pleading, a plaintiff must state clearly which defendant or defendants committed each of the alleged wrongful acts and cannot lump multiple defendants together. Canales v. Gatzunis, 979 F. Supp. 2d 164, 170-71 (D. Mass. 2013); see Sanchez v. Pereira-Castillo, 590 F.3d 31, 48 (1st Cir. 2009) ("In response to a motion to dismiss, we must determine whether, *as to each defendant*, a plaintiff's pleadings are sufficient to state a claim on which relief can be granted.") (emphasis in original).

III.    DISCUSSION

    A.    Claims Against Governor Baker in his Official Capacity

Racioppi is suing Governor Baker in his official capacity, seeking money damages. It is a matter of well-settled law that he may not do so. Federal courts are courts of limited jurisdiction. Fafel v. DiPaolo, 399 F.3d 403, 410 (1st Cir. 2005). The Supreme Court has routinely held that in a suit for money damages, "an unconsenting State is immune from suits brought in federal courts by her own citizens as well as by citizens of another State" by reason of the Eleventh Amendment. Edelman v. Jordan, 415 U.S. 651, 663 (1974). Suits against state officials in their official capacity are treated as suits against the state. Hafer v. Melo, 502 U.S. 21, 25 (1991). Similarly, 42 U.S.C. § 1983 "does not provide a federal forum for litigants who seek a remedy against a state for alleged deprivations of civil liberties." Will v. Mich. Dep't of State Police, 491 U.S. 58, 66 (1989). In other words, state officials sued in their official capacity are not "persons" for the purposes of § 1983. Id. at 70-71. Because Racioppi's claims against Baker in his official capacity are both barred by the Eleventh Amendment and beyond the scope of § 1983, such claims are dismissed.

Accordingly, Governor Baker's motion to dismiss is ALLOWED insofar as the claims against him in his official capacity are concerned.

5

B.     Section 1983 Claims Against All Defendants

Racioppi argues that (1) police officers executing the defendants' security plan refused Racioppi entry to the bandstand, interfering with his right to free speech, Doc. No. 23 at 5; (2) his inability to access the bandstand combined with the defendants' public statements demonstrate the defendants' intent to deprive Racioppi of his constitutional rights, id. at 6; and (3) Governor Baker's participation in the development of the security plan shows tacit authorization of the resulting deprivation of rights, Doc. No. 22 at 11-12. As explained in this section, the facts Racioppi has described are insufficient to plausibly allege either supervisory liability on the part of the named defendants or an actual violation of his constitutional rights.

1. Supervisory Liability

Racioppi does not allege that any defendant through their own actions personally prevented him from accessing the bandstand to speak. Therefore, his claims require plausible allegations that would support a finding of supervisory liability on the part of each defendant. Section 1983 establishes a right to sue any (1) "person" who, (2) under "color of state law," (3) deprives federal "rights, privileges or immunities." 42 U.S.C. § 1983. To establish personal liability in a § 1983 action, the plaintiff must show that the official, acting under color of state law, caused the deprivation of a federal right. Monell v. Dep't of Soc. Servs. of City of New York, 436 U.S. 658, 694 (1978). Personal participation is not the sole means for demonstrating a defendant's § 1983 liability. Under a theory of supervisory liability, the supervisor may be liable if the plaintiff can show (1) deliberate indifference and (2) an affirmative link between the supervisor's conduct and the subordinate's violative act or omission. Pereira-Castillo, 590 F.3d at 49. Liability, however, cannot rest on a defendant's position of authority alone. Ocasio-Hernandez v. Fortuno-Buset, 640 F.3d 1, 16 (1st Cir. 2011).

Officials display deliberate indifference when it would be manifest to any reasonable official that their conduct would very likely violate an individual's constitutional rights. Febus-Rodriguez v. Betancourt-Lebron, 14 F.3d 87, 92 (1st Cir. 1994). Mere negligence will not suffice, though gross negligence can signify deliberate indifference. Maldonado-Denis, 23 F. Supp. 3d at 582. Where a supervisor lacks actual knowledge of censurable conduct, liability may still attach if the supervisor formulated a policy or engaged in a custom that led to the challenged occurrence. Id. Thus, a supervisor "may be liable for the foreseeable consequences of such conduct if he would have known of it but for his deliberate indifference or willful blindness, and if he had the power and authority to alleviate it." Id. A plaintiff must also allege a strong causal connection, or "affirmative link," between the supervisor's conduct and the street-level misconduct for liability to attach: "for example, a sufficient causal nexus may be found if the supervisor knew of, overtly or tacitly approved of, or purposely disregarded the conduct." Id.

Racioppi asserts that "[t]he court should view Governor Baker's close participation in the development of Boston's security plan in combination with Mayor Walsh's statements that 'we don't want you in Boston' and that 'we will do everything in our power to keep hate out of our city' as 'condonation or tacit authorization' of the deprivation" of his rights. Doc. No. 22 at 9-10. However, the case upon which Racioppi bases this argument rejects the precise reasoning he employs.

In Pereira-Castillo, an inmate at a correctional institution was suspected of attempting to smuggle a cellphone into the facility. 590 F.3d at 37. Despite finding no contraband after numerous strip searches, x-rays, and non-surgical procedures, and notwithstanding the inmate's denials that he was attempting to conceal contraband, he was subjected to an involuntary abdominal surgical procedure. Id. at 46. The inmate then sued the correctional officers who

conducted the strip search, the doctors who performed the medical examinations and surgery, and various prison administrators who the plaintiff complained were "responsible for ensuring that the correctional officers under their command followed practices and procedures [that] would respect the rights and ensure the bodily integrity of [inmates]." Id. at 39. The plaintiff also asserted that alleged misconduct by a particular correctional officer "followed . . . the regulations and directives designed by" the administrative defendants. Id. at 49.

The district court dismissed the complaint, finding the plaintiff had not plausibly alleged a violation of his constitutional rights. Id. at 39. The First Circuit upheld the dismissal of claims against administrative defendants who had not personally participated in the challenged conduct, but on different grounds. Id. at 50. Though the complaint described strip search and x-ray regulations promulgated by one administrative defendant, the Circuit concluded that neither deliberate indifference nor the requisite "affirmative link" could plausibly be inferred from the mere existence of a poorly implemented policy or from a bald assertion that harm somehow resulted from the identified policies. Id.

Like the plaintiff in Pereira-Castillo, Racioppi has failed to allege facts plausibly showing either deliberate indifference or the causal link necessary to support claims against the three named defendants. The Amended Complaint does not sufficiently identify a specific policy resulting in the alleged deprivation; it makes only blanket reference to a "security plan" and a bald assertion that harm resulted from that undescribed plan. Doc. No. 13-1 ¶¶ 36-39. Such conclusory allegations cannot support a plausible claim of supervisory liability. The Amended Complaint also fails to show a causal link between anything the named defendants did and the harm Racioppi says he suffered. The allegations against the defendants are fairly summarized as follows: based on their status and authority as public officials as well as their public statements,

8

the defendants must have coordinated in advance of the Boston rally, must have known the (unspecified) contents of the security plan developed for that event, and must have known and intended that the plan would harm the event and impair the rights of its speakers. In the very case Racioppi cites—Pereira-Castillo—the First Circuit found such allegations insufficient to ground a plausible claim of supervisory liability under § 1983. Thus, Racioppi's constitutional claims against Governor Baker, Walsh, and Evans fail.

In his brief opposing dismissal, Racioppi argues that he has stated a claim for a § 1985(3) civil rights conspiracy. Doc. No. 22 at 5; Doc. No. 23 at 20. No such claim appears in either his original or Amended Complaint. Even assuming Racioppi's *pro se* status warrants considering this new claim—whether by construing his Amended Complaint as including it, or by construing his opposition as requesting leave to further amend in order to add it—any civil rights conspiracy claim would fail on the present record. In urging that he has plausibly stated a claim under § 1985(3), Racioppi points to allegations that the defendants publicly stated they were working together, that Walsh publicly stated he did not want the Boston rally to occur, and that the defendants collaborated to develop the security plan. Doc. No. 23 at 21-22. According to Racioppi, these allegations suffice to state the three elements of civil rights conspiracy: (1) an agreement between two or more state actors; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages. Williams v. City of Boston, 771 F. Supp. 2d 190, 204 (D. Mass. 2011).

The general cooperation among state actors will not suffice to show the requisite "meeting of the minds" among alleged conspirators. Winfield v. Town of Andover, 305 F. Supp. 3d 286, 296 (D. Mass. 2018). See also Earle v. Benoit, 850 F.2d 836, 843 (1st Cir. 1988). In Winfield, *pro se* plaintiffs sued the Town of Andover, a number of police officers, and

various fire and rescue personnel for alleged discriminatory treatment, including the prevention of one plaintiff from exercising her First Amendment rights at a town hall meeting. Id. at 290, 292. The plaintiffs alleged that police officers and fire rescue personnel "acknowledge[d] in their separate reports that they coordinated with one another," and in some cases "used exact or similar words or descriptions when referring to" a particular plaintiff. Id. at 296. Finding the plaintiffs had failed to state a civil rights conspiracy claim, Judge Young explained that the "meeting of the minds" required in order to allege the first element of such a claim cannot be "based solely on the general cooperation between" various state or local actors. Id.

Here, Racioppi describes the coordination of Governor Baker, Walsh, and Evans on essentially the same grounds as were alleged, and persuasively rejected, in Winfield. Therefore, even if Racioppi could show an underlying violation of his constitutional rights—and, as explained in the next section, he has not done so here—Racioppi has not plausibly alleged the sort of agreement among the defendants required to pursue a claim under § 1985(3).

    2. Constitutional Violations

Racioppi states that a violation of rights secured to him by the First Amendment occurred when police officers acting pursuant to the security plan developed by the defendants kept him from accessing the bandstand to speak when there was no legitimate public safety reason for doing so. Doc. No. 23 at 6-7. He claims a violation of rights secured to him by the Fourteenth Amendment occurred when the security plan prevented him and other speakers and supporters of the Boston rally from accessing the bandstand while "tens of thousands of protestors were allowed to march all over the Boston Common . . . without any sort of restrictions whatsoever." Id. at 9.  Though Racioppi's constitutional claims fail based on the absence of sufficient

allegations to support supervisory liability as to the named defendants, the claims also fail for the absence of allegations describing a violation of his constitutional rights.

Regarding the First Amendment violation, "[w]ell-settled law . . . enjoins the police from interfering with orderly, nonviolent protests merely because they disagree with the content of speech or because they simply fear possible disorder." Peña- Peña v. Figueroa-Sancha, 866 F. Supp. 2d 81, 88 (D.P.R. 2012). Nonetheless, First Amendment rights are not absolute: "[w]hen clear and present danger of riot, disorder, . . . or other immediate threat to public safety, peace, or order appears, the power of the state to prevent or punish is obvious." Cantwell v. Connecticut, 310 U.S. 296, 308 (1940). Given allegations that one officer directed him to enter the speaking area albeit in a different location, no other officer ever prevented his entry, and he left voluntarily after learning from members of the public of a possible violence, Racioppi has not plausibly alleged any government officials prevented him from exercising his right to speak secured by the First Amendment.

Racioppi's Fourteenth Amendment theory fails for similar reasons. A plausible violation of the Equal Protection Clause is established when a plaintiff pleads that they were treated differently from others similarly situated based on impermissible considerations, such as intent to inhibit or punish the exercise of constitutional rights, or malicious or bad-faith intent to injure a person. Clark v. Boscher, 514 F.3d 107, 114 (1st Cir. 2008). Political affiliation has long been recognized as a classification that may not, by itself and absent justification, serve as a basis for disparate treatment among similarly situated people. Davila Aleman v. Feliciana Melecio, 992 F. Supp. 91, 101 (D.P.R. 1997). Political affiliation, however, is neither a suspect nor a quasi-suspect classification, so allegations of discrimination on this basis are subject only to rational basis review. Id. at 101-02.

Here, the equal-protection claim is facially defective because Racioppi has identified no similarly situated individual who was treated differently by police or public officials at the Boston rally.  Rather, he alleged he was treated similarly to all persons: "[Racioppi] talked with many members of the public . . . who stated the police were not letting *anyone* inside." Doc. No. 13-1 ¶ 14 (emphasis added). While he argues (but does not allege in his complaint) that counterprotesters were not stopped from continuing their free-speech activities, those activities, according to Racioppi's arguments, occurred outside the bandstand.  Doc. No. 23 at 9. Assuming without deciding that these arguments are within the scope of his Amended Complaint in light of Racioppi's *pro se* status, the arguments fail to plausibly allege Racioppi was treated differently from similarly situated people both because of the different locations and the absence of allegations that any defendant prevented Racioppi from speaking outside the bandstand.

      C.      <u>Defamation Claim Against the Municipal Defendants</u>

In the Amended Complaint, Racioppi references several public statements by Walsh and Evans. The Court reviews those statements here, then assesses whether any or all of them can support a plausible defamation claim against either defendant. The statements identified by Racioppi are:

1. "Mayor Walsh stated to the media on August 12, 2017, 'The whole premise behind what they're doing there—the white supremacist group and the neo-Nazis, I don't quite understand what their message is. From my understanding they want to come to Boston next week. There's no place for that type of hate.'" Doc. No. 13-1 ¶ 21.

2. "On August 13, 2017 Mayor Walsh used his platform as Mayor of a major metropolitan city and said to the press 'We don't need this type of hate. So my message is clear to this

group. We don't want you in Boston. We don't want you on Boston Common. We don't want you spewing the hate that we saw yesterday, and the loss of life.'" Id. ¶ 22.

3. "On August 14, 2017 Mayor Walsh continued to . . . accuse the free-speech group as being white supremacists, neo-nazis, and domestic terrorists . . . [saying]: "We reject racism, we reject white supremacy, we reject anti-Semitism, we reject the KKK, we reject neo-Nazis, we reject domestic terrorism and we reject hatred, and we will do every single thing in our power to keep hate out of our city." Id. ¶ 23.

4. "On August 18, 2017 with Governor Baker and Commissioner Evans in front of a 'City of Boston' banner during a press conference, Mayor Walsh disregarded a question asked by the media about how the organizers of the free-speech rally can be categorized as a hate group because they invited a representative of Black Lives Matter . . . to speak: 'No, I think that—who invited them? No, I don't know, I didn't hear that. That's something—I don't know.'" Id. ¶ 25.

5. "After the free-speech event concluded, . . . [Evans said]: 'We had a job to do. We did a great job. I'm not going to listen to people who come in here and want to talk about hate. And you know what? If they didn't get in, that's a good thing because their message isn't what we want to hear.'" Id. ¶ 35.

Walsh and Evans preliminarily challenge Racioppi's defamation claim by arguing such a claim is precluded by Navom v. Walsh, No. 19-P-230, 2020 WL 1682818 (Mass. App. Ct. Apr. 7, 2020) (unpublished), rev. denied, 485 Mass. 1101 (June 11, 2020). The Court disagrees. Though it involved a similar claim arising from the same rally, that action involved a different plaintiff. The defendants have identified no basis for finding that sufficient privity exists between the two plaintiffs—Navom and Racioppi—to invoke claim preclusion principles. That said,

Navom is persuasive precedent in which a Massachusetts appellate court applying state tort law considered many statements similar to those at issue here, concluded they are conditionally privileged, and dismissed a defamation claim.

   1. Conditional Privilege

Like Racioppi, Navom was a scheduled speaker at the Boston rally who sued Walsh for defamation, complaining that Walsh's statements—including some of the same statements cited by Racioppi—inappropriately characterized him as a member of a hate group. Id. at *2. The identified statements did not refer to Navom by name. Id. at *3. Affirming the dismissal of the action, the Massachusetts Appeals Court ("MAC") reasoned that there was "no real dispute that [Walsh] spoke as a public official, about a public event, in the wake of the Charlottesville rally, which related to public safety, social justice, tolerance, free speech, and part of an ongoing and publicized national discourse." Id. at *4. Thus, the challenged statements were conditionally privileged and could not support a defamation claim absent actual malice. Id. at *4-5.

Finding Navom had not plausibly alleged malice, the MAC emphasized that his complaint "contain[ed] only conclusory and speculative allegations to the effect that the defendant must have read [a particular] website, Facebook posts, or other information, that would have alerted him that the organizers and speakers at the Boston rally were not associated with hate groups or the Charlottesville rally." Id. As the MAC explained, more is required before statements such as these can give rise to a viable defamation claim. Id.

Here, as in Navom, both Walsh and Evans were speaking as public officials about a public event relating to public safety, and they did so in the wake of the nationally publicized Charlottesville rally. As their statements were therefore conditionally privileged, Racioppi must allege either actual malice, or that the defendants entertained serious doubts as to

14

the statements' truth. Like Navom, Racioppi essentially asserts that Walsh and Evans should or must have learned of Racioppi's statements to the media disclaiming affiliation with hate groups, and that the question from a reporter about a Black Lives Matter speaker slated for the event should have caused Walsh to doubt whether the Boston rally participants were members of a hate group. Doc. No. 23 at 14. However, these allegations are plainly insufficient to support an allegation of actual malice, and they do not plausibly suggest that the defendants spoke in reckless disregard for the truth, for the reasons explained by the MAC when it rejected Navom's nearly identical arguments. Therefore, Racioppi's defamation claim founders because the statements underlying it are protected by conditional privilege.

2. Defamation Elements

Even if there were a basis to set aside the conditional privilege and evaluate the adequacy of Racioppi's defamation claim on its merits, the claim would fail. To state a prima facie claim of defamation, a plaintiff must show that the defendant was (1) at fault for the publication of a false statement (2) of and concerning the plaintiff (3) which was capable of damaging his or her reputation in the community, and (4) which either caused economic loss or is actionable without proof of economic loss. Shay v. Walters, 702 F.3d 76, 81 (1st Cir. 2012). Context is critical: a challenged statement must be examined in its totality, "consider[ing] all the words used, not merely a particular phrase or sentence." Stanton v. Metro Corp., 438 F.3d 119, 124 (1st Cir. 2006). For example, a court must consider the circumstances under which the statement was made and give weight to any cautionary terms used by the person publishing the statement. Cole v. Westinghouse Broad. Co., Inc., 435 N.E.2d 1021, 1025 (Mass. 1982).

In this case, the statements made by Walsh and Evans were not "of and concerning" Racioppi. Navom, 2020 WL 1682818 at *3. Racioppi does not—and could not—argue that any of the challenged statements specifically referenced him. Where an allegedly defamatory statement refers to a group instead of a member of the group, an individual plaintiff can show the statements were "of and concerning" him only by showing that a "special application" or "particular reference" to him can be reasonably inferred from the general commentary. Loeb v. Globe Newspaper Co., 489 F. Supp. 481, 483-84 (D. Mass. 1980). This generally requires more than merely alleging membership in the relevant group. Id. at 483; see HipSaver, Inc. v. Kiel, 984 N.E.2d 755, 766 (Mass. 2013) (explaining this element may be satisfied via extrinsic facts showing that a third person understood the challenged statement to refer to the plaintiff).

Racioppi makes no factual allegations plausibly suggesting that by referring to the group, the speakers were making statements "of or concerning" him. Without this, Racioppi has failed to state a claim for defamation.

IV.     CONCLUSION

For the foregoing reasons, Racioppi's Motion to Amend (Doc. No. 13) is ALLOWED, and the Defendants' Motions to Dismiss (Doc. Nos. 10, 18) are also ALLOWED. A separate judgment will issue promptly.

SO ORDERED.

  /s/ Leo T. Sorokin
Leo T. Sorokin
United States District Judge